UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DONNA M. CASSON,

                                        Plaintiff,

              v.                                              5:10-CV-1537
                                                             (LEK/ATB)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

HOWARD D. OLINSKY, ESQ., for Plaintiff
AMANDA J. LOCKSHIN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the

Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with

General Order 18.

## I.    PROCEDURAL HISTORY

On October 17, 2006, plaintiff protectively filed applications for disability

insurance benefits ("DIB") and Supplemental Security Income ("SSI"), alleging

disability beginning September 3, 2001.[1]  (Administrative Transcript ("T.") at

_____

[1] When used in conjunction with an "application" for benefits, the term "protective filing"
indicates that a written statement, "such as a letter," has been filed with the Social Security
Administration, indicating the claimant's intent to file a claim for benefits.  *See* 20 C.F.R. §§
404.630, 416.340.  There are various requirements for this written statement.  *Id.*  If a proper
statement is filed, the Social Security Administration will use the date of the written statement as the
filing date of the application even if the formal application is not filed until a future date.

102-111; *see also* T. 14).  Both claims were denied initially on March 9, 2007, and

plaintiff requested a hearing.  (T. 66-74).  Her claims were considered under the

agency's informal remand procedures and, on July 11, 2008, plaintiff's application

for SSI was approved with a disability onset date of October 17, 2006.  (T. 75).

Although this was a fully favorable decision with respect to plaintiff's claim for SSI,[2]

the established onset date did not entitle plaintiff to DIB under Title II of the Act.

Plaintiff objected to the onset date found in the informal remand and asked to

proceed with her hearing.  (Tr. 76).  She amended the alleged onset date to May 13,

2004 because her previous application for benefits was denied at a hearing on May

12, 2004, and plaintiff would not have been entitled to benefits on or before that date

because she did not appeal the prior determination.  (T. 33-34, 195).[3]

On March 6, 2009, plaintiff appeared with her attorney at a hearing before

Administrative Law Judge ("ALJ") Michael W. Devlin.  (T. 31-58; *see also* T. 101).

On June 15, 2009, the ALJ issued an unfavorable decision with respect to plaintiff's

application for DIB, but did not make findings regarding plaintiff's claim for SSI, as

this had already been approved.  (T. 22-30).  On July 27, 2009, the ALJ issued a

---

[2] Because a claimant is not entitled to SSI benefits prior to the month following the date of her application, 20 C.F.R. § 416.335, the ALJ's finding that plaintiff was disabled as of October 17, 2006 did not deprive her of any SSI benefits to which she might have been entitled.

[3] *See, e.g., Malave v. Sullivan*, 777 F. Supp. 247, 251 (S.D.N.Y. 1991) ("once a claimant has applied for benefits based on one set of facts, and that claim has been adjudicated as far as the claimant chose to pursue it, the Secretary's determination is binding and the Secretary can dismiss any future applications for benefits based on the same facts") (citing 20 C.F.R. §§ 404.957(c), 416.1457(c)).

revised decision, in which he noted that formal findings were required with respect to plaintiff's SSI application.  (T. 9-21).  The ALJ vacated the earlier decision, and issued a decision in which he found plaintiff to be disabled as of the date of her application for SSI, but not disabled as of June 30, 2005, her date last insured for DIB.  (T. 14, 21).  The ALJ's July 2009 decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review.  (T. 1-6).  This action followed, challenging only the denial of DIB for the period from May 13, 2004 to October 18, 2006.

## II.   FACTUAL SUMMARY[4]

Plaintiff was born in 1965 and was 43 years old at the time of the hearing.  (T. 36).  Her education included special education classes and home schooling, and she completed 10th grade.  (T. 37, 258).  Plaintiff is married with six children.  At the time of the hearing, she lived with her husband and three teenage children.  (T. 36).  Plaintiff last worked, in 2003, as a stock clerk in a convenience store.  (T. 38, 55, 122).  Prior to that, she worked, through 2001, as an assistant manager trainee at a group of airport restaurants.  (T. 40, 55).

Plaintiff was obese and had a history of tobacco use and alcohol abuse.  (T. 36, 217, 252, 302, 503).  At various times, plaintiff has been diagnosed and treated for,

---

[4] The plaintiff's brief (at 3-7, Dkt. No. 11 ) and the Commissioner's brief (at 1-6, Dkt. No. 13) fully address the facts of this case.  Additional factual details are discussed below in connection with the court's analysis of the issues in dispute.

*inter alia*, diabetes mellitus, resulting in neuropathy and retinopathy; amaurosis (vision loss) of the left eye; coronary artery disease, myocardial infarction (heart attacks), a cerebrovascular accident ("CVA"), and recurring chest pains; nephrolithiasis (kidney stones); ovarian cysts; borderline hypertension; hypercholesterolemia (high blood cholesterol); and anxiety and dysthymia (chronic depression).  (T. 17, 19, 217, 264-65, 273, 302, 458-59, 505, 507).  Because the issues in this case relate to the severity of plaintiff's medical impairments between May 13, 2004 and June 30, 2005, the court will focus on the evidence in the record relevant to that time period.

Plaintiff sought treatment at St. Joseph's Hospital on November 24, 2001, with complaints of a cough that had lasted for two months and chest pains.  (T. 448). She reported a history of diabetes and stroke,[5] but her examination was unremarkable except for frequent coughing.  (T. 449).

Plaintiff was treated at Oswego Hospital on May 11, 2004 for pelvic and abdominal pain.  (T. 435-37).  An abdominal ultrasound was read as a "[n]ormal study," with no kidney obstruction or pleural effusions.  (T. 437).  A pelvic ultrasound revealed cystic areas in the region of the uterine cervix that were consistent with Nabothian cysts.  (T. 436). A duplex ultrasound of the extracranial arteries was "[n]ormal," with no discernible plaque formation or measurable

_____

[5] Plaintiff was not certain when she had her CVA, estimating that it was in 2002.  (T. 53-54).  The cited medical records indicate that her stroke was some time before November 2001.

4

reduction in diameter bilaterally.  (T. 436-37).  A bilateral arterial flow study revealed no significant hemodynamic arterial occlusive disease.  (T. 435).

Plaintiff sought treatment at Crouse Irving Memorial Hospital on December 25, 2004, with complaints of renal colic that began the previous night.  (T. 501-502). A spiral computed tomography (CT) scan revealed a seven to eight millimeter distal left ureter stone, with obstructed left kidney.  (T. 501).  Plaintiff reported having similar episodes in the past, with the "last one in the mid-1990s," but said she had not previously required any urology intervention and had passed the stones on her own.  (T. 501).  Plaintiff returned to Crouse Hospital on December 30, 2004, with complaints of left flank pain and bloody urine.  (T. 499-500).  She was diagnosed with a kidney stone and possible kidney infection, but was prescribed medication and discharged.  (T. 499-500).  On February 21, 2005, plaintiff underwent surgery to remove a "large l-cm left distal ureteral calculus" (kidney stone) and to change her ureteral stent.  (T. 215-16).  She tolerated the procedure well, and had no complications.  (T. 216).

In January 2006, plaintiff again sought treatment for lower right quadrant pain, which reportedly started the prior November.  (T. 248-51).  On January 19, 2006, plaintiff was admitted to Crouse Hospital for severe abdominal pain.  (T. 217-219). She reported a history of kidney stones, but stated that she had no problems with kidney stones in the last year.  (T. 217).  A spiral CT of the abdomen and pelvis

5

revealed a non-obstructing stone in the left kidney and "a hypoechoic area in the left ovary, possibly a collapsing cyst."  (T. 218).

During her hospitalization at Crouse in January 2006, the doctors noted a history of poorly controlled diabetes mellitus and coronary artery disease.  (T. 217-19).  The plaintiff reported a CVA in the past, but the doctors detected no residual symptoms or deficit.  (T. 217, 219).

In January 2006, the plaintiff also reported a history of depression/anxiety, but no major psychiatric disturbances.  (T. 218).  The record contains no evidence of any treatment of plaintiff, as an adult, for mental health issues prior to January 2006.[6] Plaintiff was consultatively examined by psychologist Dr. Jeanne Shapiro on December 15, 2006.  (T. 258-62).  Plaintiff reported that her treatment effectively controlled her psychiatric symptoms and Dr. Shapiro ultimately agreed with that assessment.  (T. 259, 261-62).[7]

On December 17, 2006, Optometrist Brandi S. Coleman completed a questionnaire, following an examination of plaintiff on December 13th.  (T. 264-269). The optometrist concluded that plaintiff had "very minimal use of [her] left eye (T.

---

[6] During her hearing, plaintiff testified that she attempted suicide in 2005.  (T. 47, 52, 53). However, during a psychiatric assessment at Oswego Hospital on December 12, 2006, plaintiff denied attempting to kill herself, explaining that she took two or three pain pills because of problems with her ears and her son called 911 because he mistakenly thought she tried to overdose.  (T. 252).  The psychiatrist at Oswego Hospital diagnosed plaintiff, in late 2006, with "Dysthymia, probably Early Onset."  (T. 253).

[7] Dr. Shapiro's diagnosis was "bipolar disorder, [not otherwise specified], by report, well controlled" and "[rule out] mild mental retardation."  (T. 261).

6

268) and that the loss of vision was permanent and could not be corrected by lenses. (T. 265-66).  Dr. Coleman noted that plaintiff had decreasing vision in her left eye over the last two years, with foggy vision and difficulty focusing to read, probably as the result of poorly controlled diabetes.  (T. 264).  Plaintiff reported to Dr. Coleman that she had lost sight in her left eye initially due to a stroke, but the her vision had, for a time, returned.  (T. 265).  Dr. Coleman indicated that she had first seen plaintiff on May 7, 2004, at which time she referred her to Dr. Temnycky–an ophthalmologist–for an evaluation of ocular hypertension and pallor OS (left eye). (T. 265).  Neither plaintiff's counsel, nor the ALJ, made any apparent effort to obtain medical records from Dr. Temnycky.

Stanley Charlamb, M.D. completed a consultative examination of plaintiff on January 24, 2007.  (T.  270).  Plaintiff told Dr. Charlamb that "in 1986 she was diagnosed with a 'tumor' of the optic nerve.  She reported that "[a]pproximately four years ago her OS visual acuities both centrally and peripherally became further diminished and waned at the time of the reported CVA (stroke) . . .."  (T. 271).  She reported that she had been treated by ophthalmologist Dr. George "Saniki" or "Seniki", who "confirmed the fact that her CVA (stroke) was the cause and etiology of her OS blindness."  (T. 272).[8]  Dr. Charlamb observed that Casson's "left eye appears to be clothed with a balance lens indicating that she was essentially

---

[8] Plaintiff's counsel persuasively argues that Dr. Saniki was, in fact, Dr. George Temnycky, to whom plaintiff was referred by Dr. Coleman.  (Pl.'s Mem. of Law at 14-15 n.3).

amaurotic most probably five years ago as the eye glasses are five years old and her count fingers optimum visual acuity cannot be altered or elevated using . . . office methodologies . . ." (T. 273).

In February 2007, plaintiff was treated for chest pain at St. Joseph's Hospital with, *inter alia*, a nuclear stress test and a cardiac catheterization. Dr. Donthireddi concluded that her chest pain was "secondary to . . . stress factors rather than the cardiac or respiratory issue." The plaintiff was discharged to home with 2 liters of oxygen and a rolling walker. (T. 295-96).[9] After a follow-up examination, cardiologist Mark Reger concluded that plaintiff's chest pain was "musculoskeletal" and that she did not have a "cardiovascular illness." (T. 459).

## III.   THE ALJ'S DECISION

In his July 27, 2009 decision, the ALJ noted that plaintiff met the DIB insured status requirements of the Act through June 30, 2005. (T. 15, 17). The ALJ also found that plaintiff had not performed substantial gainful activity since May 13, 2004, the amended date on which she alleged her disability began. (T. 17; *see also* T. 33, 195). For the period from May 13, 2004 through June 30, 2005, the ALJ found that plaintiff had medically determinable impairments, which included diabetes mellitus, ovarian cyst, renal stones, hypothyroidism, coronary artery disease,

---

[9] As noted in the Commissioner's brief (at 16), these medical records contradict the suggestion that plaintiff started using oxygen full time at home in 2004 (T. 51) or that she used a walker prior to June 30, 2006 (Pl.'s Mem. of Law at 22; T. 44, 51).

a history of cerebral vascular accident, and anxiety.  (T. 17).  However, the ALJ

concluded that these impairments did not significantly limit plaintiff's ability to

perform basic work-related activities for a period of at least twelve months.  (T.

17-18).  He therefore concluded that plaintiff was not disabled prior to June 30,

2005, the date she was last insured for DIB.  (T. 21).

The ALJ did, however, find that plaintiff had severe impairments as of October

17, 2006, including total amaurosis of the left eye, diabetes mellitus with worsening

diabetic retinopathy and neuropathy, history of cerebral vascular accident, and

dysthymia.  (T. 19).[10]  The ALJ therefore continued his analysis and found that

plaintiff's impairments did not meet or medically equal a listed impairment.  (T. 16,

20).  The ALJ next determined that plaintiff had the residual functional capacity

(RFC) to perform less than sedentary work as of October 17, 2006.  (T. 20-21).  After

considering her age, education, and work experience, the ALJ determined that

plaintiff was disabled as defined in the Act as of October 17, 2006–the date of her

application for SSI.  (T. 21).

## IV.   ISSUES IN CONTENTION

The plaintiff makes the following claims:

1.      The ALJ adopted a disability onset date unsupported by substantial

---

[10] The ALJ concluded that other medical issues raised by the plaintiff–including
cardiovascular illness, hypercholesterolemia, hypertension, renal stones, anxiety, bipolar
disorder, and mental retardation–did not rise to the level of "severe" impairments, even after
October 17, 2006.  (T. 19).

evidence.

2.      The ALJ failed to develop the record.

3.      The ALJ erred when he found all of plaintiff's medically determinable impairments to be non-severe for the period between May 13, 2004 and June 30, 2005.

4.      The ALJ failed to apply the appropriate legal standards in evaluating plaintiff's credibility.

5.      The ALJ erred when he did not consult a vocational expert.

(Pl.'s Mem. of Law at 1).

This court concludes, for the reasons set forth below, that the ALJ failed to adequately develop the record and erred in how he assessed (1) whether plaintiff's subjective statements regarding her symptoms and limitations were credible; (2) whether plaintiff suffered from any "severe" impairments between May 13, 2004 and June 30, 2005; and (3) whether the onset date of her disability fell within that time period. Accordingly, it is recommended that the case be remanded so that the ALJ can properly develop the record, evaluate the totality of the medical and opinion evidence, reconsider plaintiff's credibility, and re-assess whether she suffered from severe impairments and/or was disabled between May 13, 2004 and June 30, 2005.

## V.    APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he/she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months . . . ."

42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area
> in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate disability insurance and

SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities.  If the claimant suffers such an impairment, the third inquiry
> is whether, based solely on medical evidence, the claimant has an
> impairment which meets or equals the criteria of an impairment listed in
> Appendix 1 of the regulations.  If the claimant has such an impairment,
> the [Commissioner] will consider him disabled without considering
> vocational factors such as age, education, and work experience . . . .
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.  Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. § 404.1520

(DIB) & § 416.920 (SSI).  The plaintiff has the burden of establishing disability at

the first four steps.  However, if the plaintiff establishes that her impairment prevents

11

her from performing his/her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

##### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing, *inter alia*, Johnson *v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his/her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Williams*, 859 F.2d at 258.

An ALJ is not required to explicitly set forth and analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## C.    Determination of the Onset Date of Disability

Social Security Ruling ("SSR") 83-20 requires the ALJ to determine the onset date of disability and sets forth the standards and procedure for making that determination.[11] "In disabilities of nontraumatic origin, the determination of onset

---

[11] "Social Security Rulings are agency rulings 'published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.'" *Sullivan v. Zebley*, 493 U.S. 521, 531, n. 9 (1990) (citation omitted); 20 C.F.R. § 402.35(b)(1).

involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." SSR 83-20, 1983 WL 31249, at *2.  An ALJ rejecting a claimant's alleged onset date, has an affirmative obligation to "'adduce substantial evidence to support [his or her finding].'" *Parmenter v. Astrue*, 08-CV-1132 (TJM/VEB), 2010 WL 2884866, at *4 (N.D.N.Y. April 23, 2010) (Report-Recommendation), *adopted*, 2010 WL 2803418 (N.D.N.Y. July 15, 2010) (citation omitted).  "The medical evidence serves as the primary element in the onset determination.  Reports from all medical sources . . . which bear upon the onset date should be obtained to assist in determining when the impairment(s) became disabling." SSR 83-20, 1983 WL 31249, at *2.

**D.    ALJ's Duty to Develop the Record**

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §§ 404.1512(d), 416.912(d).  In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination.  20 C.F.R.§§ 404.1512(e), 416.912(e).  "Gaps in the administrative record warrant remand for further development of the record." *Toribio v. Astrue*, 06-CV-6532, 2009 WL 2366766, at *8 (E.D.N.Y. July 31, 2009) (citing, *inter alia*, *Echevarria v. Secretary of Health & Hum. Servs.*, 685 F.2d 751, 755-56 (2d Cir.

14

1982).

"Generally, 'complete medical history' means the records of the claimant's 'medical source(s) covering at least the 12 months preceding the month in which' the claimant filed his application." *Caputo v. Astrue*, 07-CV-3992, 2010 WL 3924676, at *3 (E.D.N.Y. Sept. 29, 2010) (citing 20 C.F.R. § 404.1512(d)). "However, ALJs should gather information from an earlier period when necessary to reach an informed decision." *Id.* (citing, *inter alia*, *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 83 (2d Cir. 2009)).

### E.    Credibility Determination

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b);

416.929(a), (b).  Second, if the medical evidence alone establishes the existence of
such impairments, then the ALJ need only evaluate the intensity, persistence, and
limiting effects of a claimant's symptoms to determine the extent to which they limit
the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929 (c).  When the
objective evidence alone does not substantiate the intensity, persistence, or limiting
effects of the claimant's symptoms, the ALJ must assess the credibility of the
claimant's subjective complaints by considering the record in light of the following
symptom-related factors: (1) claimant's daily activities; (2) location, duration,
frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating
factors; (4) type, dosage, effectiveness, and side effects of any medication taken to
relieve symptoms; (5) other treatment received to relieve symptoms; (6) any
measures taken by the claimant to relieve symptoms; and (7) any other factors
concerning claimant's functional limitations and restrictions due to symptoms.  20
C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

VI.   ANALYSIS

As noted above, plaintiff asserts that she was disabled from May 13, 2004.
The ALJ determined that the plaintiff did not have any severe impairments and was,
therefore, not disabled, until October 17, 2006, the effective date of her SSI
application.  In finding that the onset of plaintiff's severe impairments and her
disability did not predate her last insured date of June 30, 2005, the ALJ precluded
plaintiff from receiving DIB benefits.  For the reasons set forth below, this court
concludes that the ALJ erred in rejecting plaintiff's alleged onset date without

adequately developing the record and without properly considering her allegations regarding the limiting effects of her symptoms.  Accordingly, this court recommends that this case be remanded for further consideration.

### A.     Development of the Record

In finding that the plaintiff had no "severe" impairments prior to June 30, 2005, the ALJ concluded that the medical records in Exhibits B-1F through B-18F (T. 215-447), did not document that those impairments produced "symptoms that more than minimally affected the claimant's ability to engage in work activity."  (T. 17).  Plaintiff claims that the ALJ failed to adequately consider or develop the record in several respects: (1) by not considering other medical records in Exhibits B-19F through B-23F (T. 448-516)[12]; (2) not requesting missing records from treating sources Dr. Feldman[13] and Dr. Temnycky; (3) not requesting or securing opinion evidence from treating sources, including SJH Cardiology Associates[14] and Dr.

---

[12] The court reviewed the medical records in Exhibits B-19F through B-23F and concluded that, with a very few exceptions, they involved plaintiff's medical condition well before or well after the relevant time frame, or were duplicates of records in Exhibits B-1F through B-18F.  Exhibit B-21F includes some non-duplicative records relating to plaintiff's hospitalization for kidney stones in December 2004 (T. 499-502), during the relevant time period.  The ALJ should consider these additional records on remand when reevaluating whether plaintiff's nephrolithiasis constituted an impairment lasting for a continuous period of not less than twelve months that was severe or disabling during the relevant time period.

[13] The medical records indicate that Dr. Feldman treated plaintiff in November 2001 (T. 448-49) and January 2002 (T. 503), more than two years before the relevant time period.

[14] SJH Cardiology Associates ("SJH") evaluated plaintiff for recurrent chest pains in 2007, well after the relevant time period, and concluded that plaintiff did not have a cardiovascular illness.  (T. 458-59).  It appears that the ALJ solicited an opinion from this medical source, which they declined to provide.  (T. 450-57).  Even if this source would provide an opinion if pressed, it is highly unlikely it would support plaintiff's position that she had severe cardiac impairments approximately two years before SJH examined plaintiff and found no such impairment.

Hanna,[15] regarding plaintiff's function-by-function limitations; and (4) not requesting a consultative intelligence examination.[16]   (Pl.'s Mem. of Law at 10-17).  While, as discussed in the notes immediately above, the court agrees with the Commissioner (Def.'s Mem. of Law at 17-19), that many of plaintiff's arguments about gaps in the record are not compelling, this court agrees that the ALJ's failure to request the treatment records of Dr. Temnycky resulted in a substantial gap in the record that

---

[15] Plaintiff's attorney stated that he had already requested a medical source statement from Dr. Hanna, whereupon the ALJ agreed to leave the record open for an additional month.  (T. 57, 194).  The ALJ was permitted to rely upon counsel's representations that he would provide this opinion testimony.  *See, e.g.*, *Dutcher v. Astrue*, No. 09-CV-1161 (LEK/VEB), 2011 WL 1097860 at *6 (N.D.N.Y. Mar. 7, 2011) (the court could not say that an ALJ failed in his duty to develop the record where the ALJ permitted ample time for a claimant's attorney to obtain additional evidence, the attorney offered no credible explanation for his failure to do so, and the evidence that was included in the record supported the ALJ's assessment) (citing *Jordan v. Comm'r of Soc. Sec.*, 142 F. App'x 542 (2d Cir. 2005)).

[16] Psychologist, Dr. Shapiro, listed mild mental retardation as a "rule out" diagnosis on Axis II following an consultative examination of plaintiff in December 2006.  (T. 261).  Despite this tentative diagnosis, however, Dr. Shapiro opined that plaintiff retained the ability to perform all of the basic demands of unskilled work.  (T. 261).  Treating psychiatrist, Dr. Patil, examined plaintiff in December 2006, and reported no cognitive deficits and no diagnosis of developmental delay.  (T. 252-53).  Plaintiff argues that the ALJ should have ordered a further consultative intelligence examination because it was necessary to determine whether plaintiff had a work-related functional limitation resulting from her possible mild mental retardation.  (Pl.'s Mem. of Law at 17, citing, *inter alia*, *Haskins v. Comm'r of Soc. Sec.*, 5:05-CV-292 (DNH/RFT), 2008 WL 5113781, at *7, n. 5 (N.D.N.Y. Sept. 11, 2008) ("If the evidence does not support work-related functional limitations resulting from the possible mental impairment, additional mental development is not necessary and completion of a Psychiatric Review Technique Form is not required and review by a psychiatrist or psychologist is not necessary") (citation omitted)).  However, as the ALJ found (T. 19), Dr. Shapiro's report, and the fact that plaintiff, whatever her intellectual limitations, was successfully employed for extended periods between 2000 and 2003 obviated the need for a further consultative examination to determine the extent of her work-related functional limitations resulting from her possible mental impairments.  *Id.*  *See also* *Serianni v. Astrue*, 6:07-CV-250 (NAM), 2010 WL 786305, at *6 (N.D.N.Y. Mar. 1, 2010) ("The medical evidence and testimony in the record do not establish that a consultative examination was necessary in order for the ALJ to reach a decision with regard to the severity of plaintiff's depression and/or anxiety.).

compels a remand.

In finding the plaintiff disabled as of October 17, 2006, the ALJ properly emphasized the worsening effects of her diabetic neuropathy and retinopathy, and the almost total loss of vision in her left eye.  (T. 19).  The evidence before the ALJ concerning the severity of plaintiff's retinopathy and vision loss prior to June 30, 2005 included the January 24, 2007 report of Dr. Charlamb (T. 270-76), in which he opined that, "most probably," the plaintiff was "essentially amaurotic" in her left eye five years before his examination.  (T. 273).  The ALJ's decision did not address this medical opinion, which indicated that plaintiff was most probably functionally blind in one eye prior to the critical date of June 30, 2005.  (T. 18-19).

The December 17, 2006 report of Optometrist Brandi S. Coleman (T. 264-69), concluded that plaintiff had very minimal use of her left eye as of late 2006, and that plaintiff suffered from decreasing vision in her left eye over the past two years.  That report raised but, did not definitively resolve, the question of the severity of plaintiff's retinopathy and vision loss before June 30, 2005.  Dr. Coleman's report indicates that she referred plaintiff to an ophthalmologist, Dr. Temnycky, on May 7, 2004, just before the critical period for determining whether plaintiff was entitled to DIB–May 13, 2004 through June 30, 2005.[17]  Although there is no indication that plaintiff's attorney requested the ALJ to obtain the records of Dr. Temnycky, these

---

[17] Dr. Charlamb reports that plaintiff acknowledged that she was seen by an ophthalmologist, apparently Dr. Temnycky, although the plaintiff misstated the doctor's name and may well have been confused about when he treated her.  (T. 272, 274).  *See* note 8 above.  At her hearing, plaintiff acknowledged poor recall regarding relevant dates with respect to her medical history.  (T. 53).

records were clearly necessary to fill a crucial gap in the medical record and the ALJ should have attempted to secure them to clarify when plaintiff's retinopathy and amaurosis of the left eye became "severe" and/or disabling.  *See* SSR 83-20, 1983 WL 31249, at *3 ("If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences [about the date of onset of disability] are made.").

On remand, the ALJ should attempt to secure the additional records relevant to plaintiff's visual impairments prior to June 30, 2005, and reassess whether any such impairments more than minimally affected the claimant's ability to engage in work activity.  If the ALJ determines that the plaintiff had any "severe" impairment before her last insured date, he would then need to proceed beyond step 2 of the disability evaluation process.  That is, the ALJ would need to determine whether plaintiff's impairments meet the criteria of a "listed" impairment, and if not, the ALJ would be required to evaluate plaintiff's residual functional capacity prior to June 30, 2005.[18] In assessing plaintiff's RFC, the ALJ would be required to consider both plaintiff's severe and non-severe impairments.  *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir.

---

[18] In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a claimant's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Id.* (citing, *inter alia, Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations.  *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

1995) (the ALJ must evaluate the combined effect of plaintiff's impairments on his/her ability to work, "regardless of whether every impairment is severe.") (citations omitted).  In assessing plaintiff's RFC, the ALJ should consider whether he should take further steps to obtain opinion evidence regarding plaintiff's functional limitations between May 13, 2004, and June 30, 2005, particularly from Dr. Hanna, her primary care doctor.[19]  If the ALJ proceeds to step five of the disability analysis, he should consider whether, because of plaintiff's non-exertional limitations, a vocational expert should be called to testify.[20]

Even if all available, relevant medical records are obtained on remand, there may not be enough contemporaneous medical records to establish the severity of the symptoms of plaintiff's various impairments prior to June 30, 2005.  However, "[i]t is well-settled that the lack of contemporaneous medical evidence does not necessarily preclude claimant's entitlement to a period of disability." *Parmenter v. Astrue*, 2010 WL 2884866, at *5 (collecting cases).  In the absence of precise medical evidence as to the onset of disability, the ALJ may be required to infer the date of disability, which requires "an informed judgment of the facts in the particular case."  SSR 83-20, 1983 WL 31249, at *3.  In particular, the ALJ should "call on the

---

[19] *See, e.g., Parmenter v. Astrue*, 2010 WL 2884866, at *5 ("plaintiff's treating providers may be able to provide retrospective diagnoses that could aid the ALJ in determining the appropriate onset date") (citation omitted); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 440-41 (S.D.N.Y.2003) (remanding due to ALJ's failure to fill in gaps in the record with a treating source opinion about the plaintiff's ability to perform work-related functions)

[20] *See, e.g,. Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986) (if the plaintiff's range of work is significantly limited by his non-exertional impairments, then the ALJ must present the testimony of a vocational expert or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform).

services of a medical advisor when onset must be inferred." *Id.* "While SSR 83-20 does not mandate that a medical advisor be called in every case, courts have construed this step to be essential when the record is ambiguous regarding onset date." *Parmenter v. Astrue*, 2010 WL 2884866, at *5 (internal quotations omitted) (citing *Plumley v. Astrue*, 2:09-CV-42, 2010 WL 520271, at *8 (D. Vt. Feb. 9, 2010) (collecting cases).

### B.  Credibility Assessment

In determining that plaintiff did not have any severe medical impairments before June 30, 2005, the ALJ stated that

> . . . her statements do not establish the intensity, persistence and limiting effects of whatever symptoms may have been present during the period of review.  The claimant's testimony was very credible, but not useful in evaluating her alleged disability during the period under review.

(T. 19).  The plaintiff did not provide a specific response to the ALJ's inquiries about when her worsening medical conditions prevented her from full-time work, although she stated that her ability to work had "never been the same" since a heart attack and stroke around 2002.  (T. 52-57).  The ALJ did not discuss plaintiff's daily activities during the relevant time period, or many of the other factors relevant to a credibility assessment.  (T. 18-19).  The ALJ emphasized that plaintiff went back to work after her stroke, and that she admittedly lost her last job, in May 2004,[21] for non-medical reasons, because the employer went out of business.  (T. 18-19; *see also* T. 40, 53-55).  However, plaintiff stated that, at her last job as a stock clerk in a convenience

---

[21] It appears that, in fact, plaintiff last worked in October 2003 (T. 122), which was corroborated by her lack of earnings in 2004 (T. 55, 113).

store, she had "a lot accidents" due to vision problems, which got her in trouble.  (T. 39-40, 122).  She also testified that she looked for work after she was let go from the convenience store, but had a "breakdown" and never found work again  (T. 53), which testimony the ALJ apparently credited.  (T.19).[22]

Although it seems inconsistent with his opinion that plaintiff's testimony was "very credible," the ALJ also stated that her statements about the intensity and persistence of her symptoms "are unsupported by medical evidence and do not establish that she had symptoms that limited her work activity."  (T. 19).  As discussed above, the ALJ's apparent focus on the lack of medical records from the period between May 13, 2004 and June 30, 2005 confirming the limiting effects of plaintiff's symptoms, was inconsistent with the requirements of SSR 83-20 and requires a remand.  *See Parmenter v. Astrue*, 2010 WL 2884866, at *5.   On remand, the ALJ should reassess plaintiff's credibility in light of the additional medical and other evidence before him, pursuant to the legal standards outlined above.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to

---

[22] The ALJ accepted the plaintiff's testimony that she attempted suicide although, as noted above, medical records suggest that she previously denied trying to kill herself.  See note 6, above.

file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated:  November 10, 2011

Hon. Andrew T. Baxter
U.S. Magistrate Judge

24